UNITED STATES of America, Appellant,

v.

BOARD OF EDUCATION OF GREENE COUNTY, MISSISSIPPI, et al., Appellees.

No. 20212.

United States Court of Appeals Fifth Circuit.

May 15, 1964.

John Doar, Atty., Dept. of Justice, Washington, D. C., Robert E. Hauberg, U. S. Atty., Jackson, Miss., Harold Greene, Atty., Dept. of Justice, Washington, D. C., Burke Marshall, Asst. Atty. Gen., Gerald P. Choppin, Alan G. Marer, Attys., Dept. of Justice, Washington, D. C., for appellant.

Joe T. Patterson, Atty. Gen., of Mississippi, Martin A. McLendon, Asst. Atty. Gen., of Mississippi, Jackson, Miss., Curtis V. Breland, Leakesville, Miss., for appellees.

Before RIVES and GEWIN, Circuit Judges, and SHEEHY, District Judge.

GEWIN, Circuit Judge.

This action was brought under 42 U.S. C.A. § 1971(b) which provides that "No person, * * * shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote * * *." Subsections (c) and (d) of Section 1971 then provide that the Attorney General of the United States may seek an injunction or other civil relief to enforce the provisions of subsection (b). The action below sought injunctive relief pursuant to subsection (d). The person alleged to have been intimidated was a Negro school teacher in Greene County, Mississippi. The alleged act of intimidation was the refusal of the appellee school Board to rehire the teacher at the expiration of her contract.[1]

---

1. The plaintiff, United States, sought a preliminary and permanent injunction and a temporary restraining order "to require the defendants to reinstate and offer a contract of reemployment to Mrs. Talbert for the 1962–63 term and to restrain the

The teacher, Mrs. Talbert, was hired by the Greene County Board of Education to teach in the all Negro Greene County Vocational School for the 1961–62 term. As is the policy with all new teachers, she was on a "trial basis" for the first year. Her contract contained no clause for renewal. Her duties were: to be the librarian; to teach business classes; to assist the principal, Hayes, in some clerical matters; and to handle a "home-room." An assistant principal, Randall, assigned her to a home room of sixty-three pupils. Talbert resented this and refused to speak to Randall for the balance of the school year. The library was in poor condition when Talbert first went to work, and it was her duty to build it up. The principal, Hayes, said that Talbert "did not produce in work to the extent that teachers of equal ability and training produced" and that as a librarian she was "very lax on the job," that her work "was not up to par."[2] He complained to Mr. Martin, the Superintendent of Education, about Talbert, her work, and her uncooperative attitude toward him and Randall, his assistant. Although Hayes complimented Talbert on her work, he explained that this was a method of achieving harmony at the school; and as he stated, commendation "always serves to lift you up."

In April, 1961, Talbert attempted to register to vote in adjoining George County where she resided, but without success. She then filed an affidavit with the Justice Department complaining of the Registrar's refusal to register her. On April 16, the Justice Department sued to require her registration. Mrs. Talbert learned about the suit for the first time when she read an account of it in the Mobile Register of April 17, 1961. On April 25, Hayes informed Talbert that Martin had refused to recommend the renewal of her contract to the school Board for the 1961–62 term.[3] In the meantime, Talbert had made application for a teaching position in Magnolia High School, Moss Point, Jackson County, an adjoining county, on April 20. This application was made before she discovered that her contract would not be renewed; and she had been conditionally accepted for employment. In fact, on the trial, Talbert testified that she was not sure that she would teach in Greene County even if the Government were successful in this suit.

Martin, the Superintendent, who refused to recommend Talbert for further

defendants from engaging and continuing to engage in such acts and practices in the future." The defendants are the Board of Education of Greene County, Mississippi, the members of the Board individually and as such members; and Evans J. Martin individually and as Superintendent of Education.

2. When on the witness stand, Hayes stated:
"Q. Have you, Mr. Hayes, had an opportunity to examine and review the work that Mrs. Talbert did in the library last year?
"A. Well, I have had an opportunity to examine it after school.
"Q. What did you find?
"A. Well, in the outset I was of the opinion that Mrs. Talbert's work had not come up to par, but with all fairness I talked to a lady who had been in the business for a number of years, Mrs. T. C. Rounseville. I told her what had been done and what I expected and all and her answer was that she thought that Mrs. Talbert had done about as

much as could be expected of a teacher over that period of time. I said to her, 'Well, I will have to back your judgment, let your judgment be here and not mine,' and she said, 'Well, I think she has done enough here now to justify that'. In fact, I made a statement to that effect, but I would have to decline after finding that I was wrong because I don't want to falsely accuse anybody."

3. Under Mississippi Statute, recommendation to the Board by Martin is prerequisite to a renewal of the contract. As stated by the Trial Court:
"The sole statutory method by which a teacher may be employed in Mississippi is for the superintendent to recommend such teacher to the school board and for the school board to approve such recommendation and authorize the superintendent to enter into a contract whereupon the superintendent does make an official and formal written contract with the teacher pursuant to such statutory course of procedure."

employment, testified that since the Board had a policy of not reinstating teachers involved in litigation, and since litigation is not conducive to good work from the litigant, the fact that Talbert was involved in litigation might have had some influence on his decision. However, he stated that other reasons prompted his refusal to recommend her to the Board, such as her uncooperative attitude at the school.[4] The Government attempted to rebut the testimony of Superintendent Martin by witnesses who testified to her good work at school, and her efforts to improve the library, etc.

The appellees proved that at least two of the teachers at the school are qualified, registered voters; Talbert's replacement, Turner, was both Hayes' and Martin's first choice at the time they hired Talbert, but they were under the impression that Turner was unavailable when Talbert was employed; none of the appellees has anything at all to do with registration or voting in George County or even in Greene County; and that the employment of several other teachers had been terminated on previous occasions for being involved in litigation.

This suit was filed on June 16, 1962, and on June 23, 1962, the Court heard and denied the application for a temporary restraining order on affidavits, counter-affidavits, and exhibits. Denial was based upon the conclusion by the Court that it was being asked to restrain the hiring of another teacher to replace Teacher Talbert, which had already been accomplished prior to the time the complaint was filed. The case was tried before the Court on its merits and evidence was taken for approximately four days during which time over twenty witnesses were heard and a number of exhibits were introduced in evidence.

After all evidence had been received, the Trial Court made a rather extensive finding of facts which may be summarized as follows: The employment contract existing between Talbert and the Greene County Board of Education related only to the 1961–62 session, was completely performed by both parties on May 18, 1962, and it contained no provision for renewal, extension or rehiring. Talbert never received any promises, express or implied, that she would be reemployed and as a matter of fact she

4. The following is from Martin's affidavit: "Contracts with new teachers are only entered into for a period of one year instead of three years authorized by statute for the reason that good school administration dictates that any new teacher be given a trial period of employment to see how that teacher performs teaching responsibilities. During the trial period, new teachers are observed and their work is checked carefully for professional competence and performance of extra-curricular activities incident to the school system.

"During the 1961–62 school year I made a personal investigation of each new teacher employed for that year. Included in this investigation was Ernestine Denham Talbert. My observation of the professional competency of this teacher and her teaching with the school system generally was that Ernestine Denham Talbert did not have good professional or social relations with some of the other teachers. She would not accept her responsibilities in extra-curricular activities, such as home room teacher, and she complained if occasion arose when she had to stay at school other than her regular teaching hours to take part in school activities which are a necessary part of the duties and responsibilities of a teacher and a necessary part of the educational program and in the education of a child. The action of Ernestine Denham Talbert in not accepting her responsibilities as other teachers did, caused dissention among some of the other teachers. Also, Ernestine Denham Talbert had very poor personal and social relations with the Principal, Mack Arthur Hayes, toward the end of the school year.

"For the reasons heretofore stated it was my conclusion that Ernestine Denham Talbert did not meet with the professional competency which I deemed to be to the best interest of the Greene County School System. After making this investigation and observation and reaching this conclusion, I determine [sic] that in the event she were recommended for an additional contract the recommendation would not meet with my approval."

made application for a teaching position in another school before being informed that she was not to be rehired. She was first recommended by her principal but Superintendent Martin would not accept the recommendation and the principal was requested to recommend another teacher. Generally new teachers are employed on a one year basis. A replacement named Turner was employed to take the place of Talbert and she was employed at a lesser salary and was preferred by the principal and the Superintendent over Talbert. In view of the fact that the Superintendent made no recommendation to the Board, the matter of rehiring Talbert was never considered or acted upon by the Board. The affidavit filed with the Justice Department by Talbert was instrumental in inducing a restraining order of the Court which permitted Talbert to register as a qualified voter and to vote in the June, 1962, primary election. The Superintendent categorically denied that his refusal to recommend re-employment was motivated by any civil rights activities; and asserted that such refusal was not designed to intimidate, coerce, threaten, or otherwise influence Talbert or other Negro teachers against registering to vote, or voting, although the Superintendent did disapprove of Talbert becoming involved in any type of litigation, and had refused to rehire other teachers for the same reason not long before this suit was filed. It was concluded that none of the defendants ever did anything in violation of the civil rights of Talbert or any other Negro and that the plaintiff had failed in its proof. The Court considered that Talbert had no vested right to a new contract and that none of the defendants, by failure to rehire her, did any act with any intent or purpose to intimidate, threaten, coerce, or create any apprehension in the mind of any Negro about registering to vote or voting and that the failure to rehire did not have such effect.

Basic to our review of the issues presented by this appeal are: (a) whether the facts found by the Trial Court are supported by substantial, credible evidence; and, (b) whether the facts found support the legal conclusions reached. The Government contends that the Trial Court committed error in concluding: (a) there was a failure to prove that the appellees violated 42 U.S.C.A. § 1971(b); (b) the appellees had not intimidated Mrs. Talbert and other Negroes for the purpose of interfering with their right to vote; and, (c) that the Court should not order the appellees to offer a contract of employment to Talbert. It is further contended that the Court should have found that in failing to rehire Talbert the appellees were motivated with an "intent or purpose to intimidate, threaten, or coerce or create apprehension" in the mind of Negroes about registering or voting; and that the Government amply proved the requirements of the statute and did prove "acts of intimidation done for the purpose of interfering with the right to vote." It is insisted that the standard of review to be applied when *purpose* is in issue is "to study the case as a whole, weighing all of the evidence and rational inferences in order to reach a net result."[5] It is argued further that reversal would be required "even if the 'clearly erroneous test' of Rule 52(a) Fed.R.Civ.P. were applied."

■■ The clearly erroneous rule is so well established in federal jurisprudence that citation of authority is unnecessary. We are bound by Rule 52(a) Fed.R.Civ.P. On appeal our decision is not reached by weighing the evidence to determine on which side of the lawsuit there is a preponderance of evidence. The fact that "intent" or "purpose" was an issue in the Trial Court does not change the rule. The determination of design, motive, purpose, or intent is also dependent upon the testimony produced at the trial, and the credit which the trier of the facts gives to the witnesses

---

5. Appellant claims that such a standard is established in the case of Meredith v.

Fair, 305 F.2d 341 (Court of Appeals, 5th Cir., 1962).

who appear and testify *ore tenus* before the Court. Findings as to intent, motive, purpose, or design are not to be tried *de novo,* but such findings are to be reviewed by the same standards applied in reviewing other facts. The rule is clearly stated in United States v. Yellow Cab Company, 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150 (1949), wherein the same contention was made by the Government. The contention was emphatically rejected.

"What the Government asks, in effect, is that we try the case de novo on the record, reject nearly all of the findings of the trial court, and substitute contrary findings of our own. Specifications of error which are fundamental to its case ask us to reweigh the evidence * * * concerned with imponderables, such as the intent of parties to certain 1929 business transactions, whether corporate officers were then acting in personal or official capacities, what was the design and purpose and intent of those who carried out twenty-year-old transactions, and whether they had legitimate business motives or were intending to restrain trade of their competitors in car manufacture, such as General Motors, Ford, Chrysler and Packard.

"These were the chief fact issues in a trial of three weeks' duration. The Government relied in large part on inferences from its 485 exhibits, introduced by nine witnesses. The defendants relied heavily on oral testimony to contradict those inferences.

\* \* \* \* \* \*

"Findings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by those who see and hear them. If defendants' witnesses spoke the truth, the findings are admittedly justified. The trial court listened to and observed the officers who had made the records from which the Government would draw an inference of guilt and con-

cluded that they bear a different meaning from that for which the Government contends.

"It ought to be unnecessary to say that Rule 52 applies to appeals by the Government as well as to those by other litigants. There is no exception which permits it, even in an antitrust case, to come to this Court for what virtually amounts to a trial de novo on the record of such findings as intent, motive and design."

To the same effect are recent rulings by this Court. Galena Oaks Corporation v. Scofield, (5th Cir.1954) 218 F.2d 217; Smith v. United States, (5th Cir.1961) 287 F.2d 299; Modern Farm Service, Inc. v. Ben Pearson, Inc., (5th Cir.1962) 308 F.2d 18. The Supreme Court elaborated upon the reasons for the rule in United States v. Oregon State Medical Society, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1951):

"As was aptly stated by the New York Court of Appeals, although in a case of a rather different substantive nature: 'Face to face with living witnesses, the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases, the exercise of his power of observation often proves the most accurate method of ascertaining the truth. * * * How can we say the judge is wrong? We never saw the witnesses. * * * To the sophistication and sagacity of the trial judge the law confides the duty of appraisal.' Boyd v. Boyd, 252 N.Y. 422, 429, 169 N.E. 632, 634."

After full and extensive findings of fact the Court reached the legal conclusion that the appellant was not entitled to the relief sought and declined to issue a mandatory injunction as prayed for in the complaint. The rule applicable to injunctions was announced early in the history of this country by Justice Baldwin, sitting at Circuit in 1830 in Bonaparte v. Camden, (C.C.N.J. 1830) Fed.Cases No. 1617: "There is no power the exercise of which is more

delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing an injunction; * * *." The rule applicable in the Fifth Circuit was succinctly stated by Judge Hutcheson in Reliable Transfer Company v. Blanchard, (5th Cir.1944) 145 F.2d 551.

"In thus arguing, appellant proceeds upon the wholly incorrect assumption that, conceding power, the issuance of the injunctions was mandatory. It is horn book law that 'Courts of equity exercise discretionary power in the granting or withholding of their extraordinary remedies, and that although this discretionary power is not restricted to any particular remedy, it is particularly applicable to injunction since that is the strong arm of equity and calls for great caution and deliberation on the part of the court.'" [Citing cases.] "Here again it is horn book law that whether an injunction will or will not issue rests within the sound discretion of the court, and that the exercise of this discretion will not be disturbed unless there has been a clear abuse of it, 45 Am.Jur., Sec. 180, p. 936."

See also Walling v. Florida Hardware Company, (5th Cir.1944) 142 F.2d 444, wherein the Court concluded: But "relief by injunction is discretionary and may be denied when the court does not deem there is danger of a repetition of unlawful conduct." W. A. Mack, Inc. v. General Motors Corp., (7th Cir.1958) 260 F.2d 886, states the Seventh Circuit rule to be: " * * * mandatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds." Discretion of the Trial Court must clearly be abused before appellate courts will reverse for failure to grant a mandatory injunction, United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1952): "The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it."

■ Judged by the standards herein outlined we cannot conclude that the findings of fact by the Trial Court are clearly erroneous, but on the contrary, we are firmly convinced that such findings are amply supported by substantial evidence. The Trial Court did not abuse its discretion in refusing to grant the extraordinary remedy sought, a permanent mandatory injunction.

In view of our conclusions we do not reach the Trial Court's interpretation of the Mississippi law in cases applicable to school teachers and boards of education, and the conclusion of the Trial Court that the granting of the relief sought would be " * * * to make a contract and then enforce it." [6]

The judgment is affirmed.

RIVES, Circuit Judge (concurring specially):

The Government properly concedes that:

"The statute [42 U.S.C. 1971(b)] essentially requires proof of two ultimate facts: (1) that there was an intimidation, threat, or coercion, or an attempt to intimidate, threaten, or coerce, and (2) that the intimidation was for the purpose of interfering with the right to vote."

Ultimate fact (1) is, I think, established by the undisputed testimony to the effect that at least one of the reasons why Mrs. Talbert was not re-employed was her involvement in the Government's voting suit.[1] I agree with the majority,

6. In Lott v. State, 121 So.2d 402 (1960), the Supreme Court of Mississippi, in interpreting various applicable provisions of the Mississippi Code, stated: "Although political and factional considerations should not enter into a recommendation by a county superintendent and an approval by a county board, it is not a judicial function to determine the extent to which those facts affected Lott and the board."

1. Superintendent Martin testified (R. 408): "Q. But there was nothing about Mrs.

 

however, that the finding of the district court[2] that the Government failed to meet its burden of proving ultimate fact (2) is not clearly erroneous. For that reason I concur in affirming the judgment of dismissal.

---

Talbert's performance of her duties that caused you not to recommend her?

"A. It was lack of cooperation in the things that I have mentioned, plus the fact that she was involved in litigation which was not conducive to good work from her nor good for getting the best from the school nor good for the relations among the teachers. It was a controversial matter."

2. The district court found that the Government had failed to prove by a preponderance of the evidence (R. 612): " * * * that either of the defendants, in not rehiring her, did so with any intent or purpose to intimidate, threaten or coerce or create any apprehension in the mind of any negro about registering and/or voting in his county * * *."